## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **EILEEN M. BURKLEY,** *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civil Case No. SAG-18-2665** |
| | * | |
| **CORRECT CARE SOLUTIONS, INC.,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

### MEMORANDUM OPINION

Eileen M. Burkley, Individually and as Personal Representative of the Estate of John K. Burkley, II, Deceased, and as Parent and Next Friend of her three minor daughters (collectively, "Plaintiffs"), filed an Amended Complaint seeking damages arising from the death of her husband while in the custody of the Harford County Detention Center ("HCDC"). ECF 19.   Plaintiffs asserted claims against HCDC's medical care provider, Correct Care Solutions, Inc. ("Correct Care") and eleven of its individual medical professionals (collectively, "Defendants").[1]   *Id.* Defendants have filed a motion for partial summary judgment, ECF 41, and supporting memorandum of law, ECF 41-1.   Plaintiffs have filed an Opposition, ECF 42, and supporting memorandum of law, ECF 42-1, and Defendants have filed a Reply, ECF 45.   This Court has reviewed the filings and associated exhibits, and no hearing is necessary.   *See* Loc. R. 105.6 (D. Md. 2018).   For the reasons that follow, the Motion will be granted in part and denied in part.

---

[1] One of the individual defendants, LPN Keith B. Myers, is not represented by counsel and is not a party to the instant Motion.   As used herein, "Defendants" refers to all of the Defendants except Myers.

## I.      FACTUAL BACKGROUND

The facts in this case are largely undisputed. In August, 2017, Correct Care served as the medical contractor at HCDC, providing health care services to HCDC's inmates. ECF 41, Ex 1 No. 14. From August 15, 2017 through August 26, 2017, Burkley was incarcerated at HCDC. ECF 42-1 at 2, 10-11. Burkley, who had worked as an insurance sales agent for over two decades, ECF 42-2, Ex. 1 at p. 13, 1. 1 – p. 16, 1. 17, had a complex medical history prior to his incarceration. ECF 42-2, Ex 2-3. He had a history of alcohol addiction, which had resulted in medical treatment and prior alcohol-related criminal offenses. ECF 42-2, Ex. 2 at p. 2; ECF 41-2, Ex. 2 at p. 36, l. 1-18. Burkley also had multiple surgeries, including left knee surgeries and associated infections and septic arthritis. ECF 42-2, Ex. 2 at p. 2. He suffered from diabetes, high blood pressure, and sleep apnea. *Id.*; ECF 41-2, Ex. 2 at p. 36, l. 19-20.

Most relevant to this case, Union Hospital admitted Burkley on August 6, 2017, following a fall. ECF 42-2, Ex. 2 at 1. The admissions records note a diagnosis of "sepsis, complicated by MSAA bacteremia, in the setting of prosthetic joint septic arthritis of left knee." *Id.* The early sepsis screening result, though, was negative. *Id.* at 1-2. Burkley told his treating physician that he had been "running out of Bactrim over the last 1-2 months and thus has not been taking the prophylactic therapy is[sic] indicated." *Id.* at 1. He also stated that his left knee "is always swollen since the knee surgery at Sinai in Baltimore [in October 2016]." ECF 41-2, Ex. 3 at p. 63. The treating physician at Union Hospital prescribed long-term IV antibiotic therapy for at least four weeks, and wrote an additional prescription for an oral antibiotic, Bactrim DS 800 mg, for seven days. ECF 41-2, Ex. 4 at p. 93.

However, Union Hospital subsequently transferred Burkley to Sinai Hospital on August 11, 2017, for further evaluation and treatment by his orthopedic surgeon. ECF 42-2, Ex. 2 at p. 3. Treatment notes reflected that Burkley "was not a surgical candidate and he could be placed on

2

antibiotics for his knee."  ECF 42-2, Ex. 3 at p. 1. After intravenous antibiotic treatment, Sinai

Hospital discharged Burkley on August 14, 2017, with prescriptions for dicloxacillin (an oral

antibiotic) for 30 days with four refills.  *Id.* at 1-2. Burkley's discharge instructions included the

statement, "Take your antibiotics as prescribed!"  ECF 41-2, Ex. 3 at p. 67.

**Medical Treatment at HCDC**

Just hours later, between the evening of August 15, 2017 and the morning of August 16,

2017, Burkley was incarcerated at HCDC.  ECF 42-2, Ex. 4.  Upon arrival, Keith B. Myers, a

Licensed Practical Nurse ("LPN"), conducted a medical intake interview.  *Id.* at 7.  During that

interview, Burkley did not report his diagnoses of sleep apnea and hypertension, and did not

mention his prescription of dicloxacillin from Sinai Hospital.  *Id.* at 1-2.  Instead, Burkley told

LPN Myers that he had an unfilled prescription for Bactrim.  *Id.* at 2.  Because Burkley's

pharmacy, Northside Pharmacy, was closed at the time of the intake around 2 a.m., LPN Myers

entered a note in the system for medical staff to verify medications with the pharmacy when it

opened.  ECF 42-3,  Ex. 6 at 48:5-8 ("Please call the meds at Northside.")

Registered Nurse ("RN") Lauren Watson reviewed Burkley's intake form.  ECF 42-2, Ex.

4 at 7.  RN Watson testified that she was not present at the intake interview, but was responsible

for ensuring that LPN Myers had filled out the intake form in its entirety.  ECF 41-3, Ex. 9 at 15:2-

7; 25:17-18.  RN Watson testified that it was not her role to verify Burkley's prescriptions, to

contact his prior treating hospitals, or to generate a staff referral to have Burkley's antibiotics

verified or obtained.  ECF 41-3, Ex. 9.

On August 17, 2017, Dr. Lino Quilo examined Burkley, ECF 41-3, Ex. 4 at 41, and ordered

daily blood pressure checks for one week, and daily wound care for his right big toe for five days.

ECF 41-2, Ex. 4 at 45.  Although Dr. Quilo ordered certain medications for Burkley, he had not

reviewed Burkley's medical screening questionnaire, and was unaware of Burkley's recent hospitalization for a knee infection and his unfilled prescription for antibiotics. ECF 42-2, Ex. 17 at 42. Accordingly, Dr. Quilo did not order antibiotics for Burkley.

On that same date, RN Rachel Finn verified Burkley's existing prescription medications with Northside Pharmacy. ECF 41-2, Ex. 4 at 22. RN Finn requested that the pharmacy fill Burkley's active medications. ECF 41-32, Ex. 6 at 44:10-12. The pharmacy could not verify Burkley's Bactrim prescription, because he had not brought it to the pharmacy to fill. *Id.* RN Finn did not take any action to obtain Burkley's prior medical records from Sinai Hospital.

Between August 16, 2017 and August 19, 2017, LPN David Christensen checked Mr. Burkley's blood sugar and gave him a dressing change. ECF 41-3, Ex. 10, at 10:6-20. Records reflect that Correct Care staff provided Burkley with the medication from his verified prescriptions daily, beginning on August 17, 2017, and that his vital signs were checked on August 16, 18, 19, 20, 22, 23, 24, and 26, sometimes more than once per day. ECF 41-2, Ex. 4, at 1-2. Prison medical records indicate, however, that during Burkley's first week of incarceration, the correctional officers described him as appearing "to be in very poor condition" and "sick." ECF 42-3, Ex. 19 at 1.

On August 19, 2017, Burkley asked to be transferred to a medical facility for a CT scan and an orthopedic evaluation, because he claimed "pain, discomfort and stiffness" from a "potential staph infection" in his left knee. ECF 41-2, Ex. 4 at 44. However, for several days, he was not seen by a medical provider for evaluation of his infection, and did not receive antibiotics.

On August 22, 2017, Physician's Assistant ("PA") Keena Dillard examined Burkley's left knee to assess his complaints. ECF 41-2, Ex. 4 at 24. Burkley told PA Dillard that he had taken antibiotics for cellulitis and staph infection, but inaccurately reported that he had completed the

course of antibiotics.  *Id.*  On examination, Burkley's knee exhibited mild swelling, but was not red or warm to the touch.  ECF 41-2, Ex. 8 at 52:11-14.  PA Dillard noted that Burkley "appears with confusion and slightly beginning of Dementia."  ECF 41-3, Ex. 8 at 63:1-64:10.  Ultimately, PA Dillard ordered a rolling walker to account for Burkley's abnormal balance, and a wheelchair for long distances.  ECF 41-2, Ex. 4 at 24.  She did not prescribe antibiotics, or any other medication.  PA Dillard also requested Burkley's past medical records.  ECF 41-3, Ex. 8 at 52:14-17.  In response, on August 23, 2017, Sinai Hospital faxed Burkley's treatment records to Correct Care, including the records indicating that Burkley had been prescribed 30 days of antibiotics earlier in the month.  ECF 41-2, Ex. 4 at 130.

Also on August 23, 2017, Burkley's attorney wrote to the warden of HCDC, indicating that he was concerned about his client's deteriorating medical condition.  ECF 42-3, Ex. 23. Specifically, the attorney noted that Burkley "seemed lethargic, not as alert as he has been and his knee appeared to be swelling again."  *Id.*  The attorney submitted various medical records, accompanied by a chronology of Burkley's recurrent knee infections and septic arthritis of the knee.  ECF 42-3, Ex. 24.

At approximately 5:45 a.m. on August 24, 2017, a correctional officer noticed that Burkley was unable to get out of bed, and had urinated on the floor.  ECF 42-3 Ex. 25.  He contacted medical staff.  *Id.*  At 7:09 a.m., RN Lucy Manwarring came to speak with Burkley, and noted that he was speaking in circles and imagining that his wife had visited him the night before.  ECF 42-3, Ex. 25.  Nevertheless, RN Manwarring did not review the Sinai hospital records and did not take further action with respect to Burkley's condition.

Later that morning, a social worker reported that Burkley's leg was swollen, and that he complained of leg pain and had trouble moving around.  ECF 42-3, Ex. 27.

On that same day, LPN Sandra L. Gainey-Hodiste delivered a cup for a urine sample to Burkley's cell.  ECF 42-3, Ex. 28.  Burkley declined to provide a urine sample without speaking to his attorney.  *Id.*

Also later that afternoon, Dr. Quito again examined Burkley.  ECF 42-2, Ex. 17 at 42.  This time, Dr. Quilo reviewed Burkley's initial medical screening questionnaire, and noted his history of septic arthritis in the left knee.  ECF 42-3, Ex. 29 at 9.  By that time, he was aware of Burkley's recent hospitalization and unfilled prescription for antibiotics.  ECF 42-2, Ex. 17 at p. 52.1.12 – p. 53.1.9; p. 54.1.16 – p. 55.1.16. The results of Dr. Quilo's physical examination were abnormal – Burkley could not transfer himself to and from the examination table, and he had a highly elevated heart rate.  ECF 42-3, Ex. 29 at 9; ECF 42-3, Ex. 30 at 11, 28.   Dr. Quilo ordered Burkley transferred to the medical housing unit as a fall risk, but still did not order antibiotics for Burkley. ECF 42-3, Ex. 30 at 29.

Later that day, STAT laboratory results ordered by Dr. Quilo were returned to Correct Care.  ECF 42-3, Ex. 31. Several of the results were significantly abnormal, including Burkley's white blood cell ("WBC") level, which was more than three times the upper limit of the normal range.  *Id.* at 55.  RN Dan Shifflett reviewed the results and notified the on-call provider, PA James A. Piazza.  ECF 42-3, Ex. 32.  PA Piazza testified that he did not recall seeing such a high WBC level before.  ECF 42-3, Ex. 33 at p. 32.1.20-22.  However, he concluded that no further treatment was necessary, pending the results of a urine analysis.  ECF 42-3, Ex. 33.

On the morning of August 25, 2017, PA Dillard examined Burkley as a result of his laboratory values and the continuing concern by the correctional officers about his condition.  ECF 42-3, Ex. 22 at p. 83.1.15 – p. 84.1.20; p. 85.1.12 – p. 86.1.10.  Correctional officers had reported that Burkley exhibited confusion, disorientation, and weakness, was sweating, and was unable to

walk without assistance.  ECF 42-3, Ex. 20.  PA Dillard ordered oral antibiotics (specifically Bactrim DS), but did not transfer Burkley to a hospital for evaluation or treatment.  ECF 42-3, Ex. 34.

At 5:40 a.m. on August 26, 2017, a correctional officer noted that Burkley "did not appear in a medically stable state."  ECF 42-3, Ex. 35.  LPN Myers evaluated Burkley, *Id.*, and later reported to the oncoming LPN (Sarah Healy) during the 7 a.m. shift change that she might want to contact the on-call provider to obtain orders to transfer Burkley to a hospital.  ECF 42-3, Ex. 36 at 144. At about 9 a.m., a medical technician had to assist Burkley with holding his head up to take pain medication.  ECF 42-3, Ex. 37 at 169-70.  The medical technician noted his pain score as 10/10, stated that he "looked like he was really in pain," and had been in a similar condition the night before.  *Id.* at 172-73.

At approximately 10 a.m., LPN Healy suggested to PA Shifflett that Burkley should be transferred to a hospital. ECF 42-3, Ex. 36 at 149.  However, without evaluating Burkley, PA Shifflett decided not to begin the transfer process.

Between 10:58 a.m. and 12:38 a.m., Burkley was visited by LPN Healy, LPN Christensen, and RN Shifflett.  ECF 42-3, Ex. 39.  When the three medical providers appeared at 11:51 a.m., Burkley was lying halfway off his bunk, was sweating profusely, and was not fully oriented.  *Id.* They were unable to obtain his blood pressure.  ECF 42-3, Ex. 40.  Eventually, RN Shifflett notified the on-call provider, PA Dillard, to obtain transfer orders.  *Id.*  911 received the call for transport at 12:24 p.m.  ECF 42-3, Ex. 19 at 4.

When EMS arrived at approximately 12:40, they noted that Burkley was confused, incoherent, cold, pale, jaundiced, clammy, and sweating.  ECF 42-3, Ex. 19 at 2. A correctional officer reported that Burkley's condition over the prior week had been "very poor."  *Id.* at 1.

Eventually, Burkley became unresponsive, and EMS had to initiate cardiopulmonary resuscitation. *Id.*

Upon arrival at Upper Chesapeake Medical Center, the attending physician diagnosed Burkley with "severe sepsis" and "cardiac arrest." ECF 42-3, Ex. 41 at 158. The physician believed Burkley had been septic "for last several days." *Id.* Blood work indicated a further increase in Burkley's already elevated WBC level. ECF 42-3, Ex. 42. Following a code blue, Burkley died at approximately 5:39 p.m. ECF 42-3, Ex. 43.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.   ANALYSIS

Defendants do not seek summary judgment as to Counts I (wrongful death) and IV (survival) of Plaintiffs' Amended Complaint, because those causes of action require only a showing of negligence. Instead, Defendants seek partial summary judgment as to the remaining three counts: Counts II (42 U.S.C. § 1983) and III (Article 24 of the Maryland Declaration of Rights), which require a showing of "deliberate indifference to serious medical needs" of a prisoner, and Count V (failure to obtain informed consent). In addition, Defendant Gainey-Hodiste seeks summary judgment as to all claims against her, in light of her limited contact with Burkley during his incarceration.

### A.  Deliberate Indifference

Claims under Article 24 of the Maryland Declaration of Rights are assessed under the same standard as a due process claim pursuant to 42 U.S.C. 1983. *See Pickett v. Sears, Roebuck & Co.,*

365 Md. 67, 77 (2000) ("This Court has interpreted Article 24 of the Maryland Declaration of Rights and the Due Process clause of the Fourteenth Amendment of the United States Constitution to be *in pari materia*"). Specifically, both claims turn on whether treating medical sources engaged in conduct amounting to "deliberate indifference to a serious medical need." *Farmer v. Brennan,* 511 U.S. 825, 835 (1994) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)).  That standard first requires proof that the prisoner was suffering from an objectively serious medical need. *De'lonta v. Johnson,* 708 F.3d 520, 525 (4th Cir. 2013).  Second, the plaintiff must show that, subjectively, the prison staff had a "sufficiently culpable state of mind." *Id.*

"Deliberate indifference" describes a state of mind more blameworthy than negligence. *Id.* "Actual knowledge or awareness on the part of the alleged inflicter thus becomes essential to proof of deliberate indifference because prison officials who lacked a knowledge of a risk cannot be said to have inflicted punishment." *Bruce v. Virginia Beach Correctional Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (citation omitted). As the Supreme Court explained:

> Because, however, prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

*Farmer,* 511 U.S. at 844.

Given that there are ten medical providers whose actions are alleged to have amounted to deliberate indifference, the Court will assess each provider's actions individually, as the parties have in their respective briefs.  Essentially, as set forth below, this Court concludes that as to the providers who treated Burkley on or after August 24, 2017, when his medical condition had

declined precipitously, or who were made aware of the abnormal results of his WBC testing on August 23, 2017, a genuine issue of material fact exists as to whether the providers acted with deliberate indifference to his obvious and serious medical needs.[2]  In the end, Plaintiffs may have an uphill battle to prove deliberate indifference to a jury, in light of the lack of any evidence of intent or animosity in the facts of this case. However, drawing all inferences in the light most favorable to Plaintiffs, as the Court must at this stage, a factfinder could determine that the medical care provided to Burkley was so deficient as to amount to deliberate indifference to his obviously deteriorating condition.

### 1.  Dr. Lino Quilo

Dr. Quilo treated Burkley on several occasions during his incarceration.  ECF 41-2, Ex. 4. He conducted the first physical examination of Burkley on August 17, 2017, at which he ordered certain medications, daily blood pressure checks, and daily wound care for his right big toe. ECF 41-2, Ex. 4 at 41, 45.  Although Dr. Quilo conceded that he had not reviewed Burkley's intake questionnaire before the examination, ECF  42-2, Ex. 17 at 42, in light of Burkley's relatively benign medical condition on August 17, 2017, no serious medical need would have been obvious to an examiner on that date.

However, on August 24, 2017, Dr. Quilo again examined Burkley in person. ECF 42-2, Ex. 17 at 42. On that date, Burkley had urinated on the floor of his cell, and was having difficulty walking such that Dr. Quilo ordered him into medical housing. ECF 42-3, Ex. 30 at 29.  Moreover, Burkley's medical records from Sinai Hospital had arrived at Correct Care, but there was no evidence that Dr. Quilo sought to review them, despite Burkley's deteriorating condition.  ECF

---

[2] LPN Gainey-Hodiste's conduct is assessed separately below, in light of her contention that all of the claims against her, including the deliberate indifference claims, are subject to summary judgment.

42-2, Ex. 17 at p. 52.1.12 – p. 53.1.9; p. 54.1.16 – p. 55.1.16. Dr. Quilo ordered laboratory tests STAT, but the record does not reflect that he took any action to follow up on the results of those tests. ECF 42-3, Ex. 31. As noted above, then, a reasonable factfinder could conclude that Dr. Quilo's actions (and lack of actions) during and following his August 24, 2017 examination constituted deliberate indifference.

### 2. PA Keena Dillard

Like Dr. Quilo, PA Dillard also treated Burkley on multiple occasions. On August 22, 2017, PA Dillard examined Burkley in connection with his complaints of knee pain, but did not find warmth or redness associated with the mild swelling in his left knee. ECF 41-2, Ex. 4 at 24 ("He does state that he completed his antibiotic treatment for the Staph infection. . . Records will be obtained for further clarity and understanding of his prior treatment. No current or immediate treatment needs to be done. Left knee is well healed without signs of infection. Mild swelling noted of left knee."). Again, no finding of deliberate indifference is warranted based on solely the first examination, where no serious medical need would have been evident to an examiner.

However, PA Dillard treated Burkley again on August 25, 2017, after his highly irregular laboratory test results were available. PA Dillard prescribed an oral antibiotic on August 25, 2017, due to Burkley's extremely high WBC. ECF 42-3, Ex. 22 at p. 83.1.15 – p. 84.1.20; p. 85.1.12 – p. 86.1.10. A reasonable factfinder could determine that PA Dillard's actions were inadequate to the point of deliberate indifference, given the severity of Burkley's medical condition on that date. *See, e.g., Mandel v. Doe,* 888 F.2d 783, 789 (11th Cir. 1989) ("When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."). PA Dillard also participated in Burkley's care on August 26, 2017, when she advised RN Shifflett to put Burkley on oxygen and to call 911 for transport to the medical

center. ECF 42-3, Ex. 40. Presumably, Plaintiffs do not assert deliberate indifference, or even negligence, relating to that specific action.

### 3.  RN Lauren Watson

Other than Defendant Gainey-Hodiste, RN Watson had the least involvement with Burkley's care.  RN Watson was charged with reviewing and approving the medical intake form completed by LPN Myers upon Burkley's arrival at HCDC. ECF 42-2, Ex. 4 at 7.; ECF 41-3, Ex. 9 at 15:2-7; 25:17-18. She testified as to her duties as the reviewer, which involved ensuring that the intake form had been filled out completely. *Id.*   RN Watson did not ever see Burkley as a part of the review process.  ECF 41-2, Ex. 9 at 14:19-22.

Plaintiffs contend that RN Watson exhibited deliberate indifference in her failure to verify Burkley's prescription for antibiotics. ECF 42-1 at 15-16. Correct Care's Medication Verification Policy states, "Routine medications prescribed for daily use should generally be initiated within 24 hours of intake.  During this period the medication should be verified and a supply obtained."[3] ECF 42-2, Ex. 5 at 2.  Because Burkley's initial intake occurred in the middle of the night, outside of business hours, LPN Myers put a notation in the system to have a call placed to Northside Pharmacy the next morning.  ECF 42-2, Ex. 4 at 14.  However, the Bactrim (and especially the dixocloxillin which Burkley did not mention to LPN Myers) could not be verified or filled via pharmacy contact.  Neither LPN Myers nor RN Watson ensured that contact would be made with

---

[3] The verification policy Correct Care implemented at HCDC permitted an inmate's active prescription to be continued during confinement on the basis of the outside prescriber's "prior evaluation and decision," but one of the factors to be weighed is that "the medication was timely filled (implying patient adherence)."  *Id.*  Under those standards, Burkley's antibiotics would not have been able to be verified.  In such cases, the policy directs that "a HCP should be consulted for direction." *Id.* at 17.  Such consultation may have caused an eligible medical treater, such as Dr. Quilo, to consider prescribing antibiotics to Burkley before August 25, 2017.  It is worth noting, however, that even once medical providers became aware of Burkley's unfilled antibiotics prescription later in his confinement, they did not order the medication.

Burkley's treating physicians to obtain his medical records or to verify the unfilled prescription Burkley had (inaccurately) described.

Though a genuine issue of material fact exists with respect to whether that failure constitutes negligence, Plaintiffs have not adduced any facts to demonstrate that RN Watson intentionally or deliberately failed to provide required treatment. *See Estelle v. Gamble,* 429 U.S. 97, 105 (1976) ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'"). While Watson's conduct may not have complied with the dictates of Correct Care's verification policy, she could not have foreseen that the verifier the next morning would take no action with respect to the unfilled prescription, that the examining physician would not review the intake form, or that Burkley would fail to mention his recent hospitalization and antibiotic prescription to his examining doctor. Indeed, the fact that she attempted to facilitate a call to the pharmacy belies any assertion that she intentionally tried to deprive Burkley of his prescription. While, in hindsight, the failure of the intake staff to flag the unfilled prescription contributed to a chain of events in which Burkley did not receive antibiotics, the pertinent facts do not suggest, or constitute admissible evidence of, deliberate indifference. Accordingly, summary judgment for RN Watson is appropriate as to Counts II and III, although the negligence-based claims against her will proceed to trial.

### 4.  RN Rachel Finn

RN Finn's first contact with Burkley's care was her effort to verify his medications on August 16, 2019, after receiving the instruction from LPN Myers to call Northside Pharmacy. . ECF 41-2, Ex. 4 at 22. RN Finn did not review Burkley's screening questionnaire when calling to verify his active medications. ECF 41-2, Ex. 6 at 44. While, again, it is unclear which employee

or employees failed to comply with their duties under Correct Care's verification policy, their conduct does not amount to deliberate indifference to a serious medical need.

However, RN Finn is one of the multiple medical providers who examined Burkley on August 24, 2017, the date on which officers reported that he was "completely disoriented and urinated all over the floor earlier today." ECF 42-3, Ex. 30 at 28.  In her treatment notes, RN Finn described him as "oriented to time place and person however does have periods of confusion." *Id.* She noted "stat labs drawn." *Id.*  RN Finn accessed the results from the laboratory testing at home, but took no further action once she saw that RN Shifflett had already notified the on-call provider of the results.  ECF 41-3, Ex. 6 at 83:11-19.  Of course, a factfinder will evaluate, under both the negligence and deliberate indifference standards, whether any culpability for inadequate treatment rests with the RNs, or whether the involvement of PAs and physicians in Burkley's treatment relieves the RNs from responsibility for treatment decisions.  However, in light of the expert testimony suggesting culpability on the part of the nursing staff, summary judgment will be denied.

### 5.  RN Lucy Manwarring

RN Manwarring's interaction with Burkley was somewhat similar to that of RN Finn.  RN Manwarring treated Burkley on the morning of August 24, 2017, when he had urinated on the floor, and was reported to have been unable to move around, unable to get up to use the bathroom, and unable to feed himself.  ECF 42-3, Ex. 25. When RN Manwarring spoke to Burkley, he was talking in circles and unable to communicate effectively. *Id.*  ("Inmate was seen in housing area because officer stated that inmate is confused.  Inmate was lying on bunk.  There was urine on the floor.  Inmate was asked if he was aware that he urinated on the floor.  Inmate replied yes.  He stated that he did not reach to the toilet in time.  Inmate AOx3.").  Manwarring took no further action and did not review Burkley's medical records.  A social worker who also saw Burkley that

morning noted his leg pain, difficulty moving, and swollen leg, ECF 42-3, Ex. 27, which could lead a factfinder to conclude that RN Manwarring had exhibited deliberate indifference to his serious medical needs.  Thus, summary judgment will be denied.

### 6.   LPN Sarah Healy/LPN David Christensen/RN Dan Shifflett

These three members of the nursing staff worked the morning shift of August 26, 2017, beginning around 7 a.m.  ECF 42-3, Ex. 36 at 144.  LPN Healy learned, at the start of her shift, that the outgoing nurse had concerns about Burkley's condition, and she told the correctional officer that she wanted to be let in to Burkley's cell at the earliest possible time.  *Id.*  LPN Christensen was keeping 15 minute watch on Burkley's cell from 8:15 a.m. -10:40 a.m. ECF 41-3, Ex. 10 at 16:7-12. Despite their earlier information about Burkley's medical state, and their observations, none of them called 911 until around noon, a delay that could cause a factfinder to find deliberate indifference to his serious medical needs.

### 7.   PA-C James Piazza

Although the record does not reflect that PA Piazza ever treated Burkley in person, he was the on-call provider on the evening of August 23, 2017, when Burkley's laboratory testing results returned to Correct Care. ECF 42-3, Ex. 33 at 32. Piazza learned of the extremely high WBC reflected in Burkley's report, plus other abnormal laboratory values that might indicate sepsis. *Id.* Piazza decided that no treatment was necessary until Burkley's urine analysis results had been received. *Id.* at 33.  At deposition, however, PA Piazza conceded that he did not recall ever having seen WBC levels so high. *Id.*  Moreover, expert testimony from Plaintiffs' experts suggests that, in fact, the WBC values were so high that Burkley should have been hospitalized for acute

infection.  ECF 42-2 at 78:22-79:23.[4]  Thus, a reasonable factfinder could conclude that the inadequate action taken by PA Piazza constituted deliberate indifference to the indicia of sepsis in the laboratory results.

### 8.  Correct Care Solutions, LLC

Plaintiffs appear to concede that Count II is not viable against Correct Care, as they did not respond to Defendants' arguments about deliberate indifference.  *See generally* ECF 42-1.  The doctrine of *respondeat superior* cannot be used to establish corporate liability for constitutional deprivations by its employees.  Instead, "private corporations can only be held liable under § 1983 if 'an official policy or custom of the corporation causes the alleged deprivation of federal civil rights.'" *Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 355 (4th Cir. 2003) (quoting *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999)).  Plaintiffs do not allege any specific policies or customs to be deficient in this case.  In fact, several of Plaintiffs' expert witnesses opined that Correct Care's policies were adequate, though not always followed to the letter. ECF 42-2, Ex. 8 at 32:12-15 (expert stating he has "no criticisms" of Correct Care's policy regarding initiation of medication upon arrival); ECF 42-2, Ex. 12 at 67:4-10.

However, Correct Care can be liable under a *respondeat superior* theory for state constitutional violations by its employees.  *See DiPino v Davis*, 354 Md. 18, 52 (1999).

---

[4] RN Shifflett called to refer the blood test results to PA Piazza.  Plaintiffs' own experts had divergent views as to the adequacy of RN Shifflett's conduct in that regard. *Compare* ECF 42-2 at 80:10-81:4 (no criticisms of RN Shifflett's decision to refer the information to PA Piazza) *with* ECF 42-2 at 69 ("Mr. Shifflett negligently failed to obtain a complete medical history of Mr. Burkley's infected leg/knee, negligently failed to review Mr. Burkley's medical file, including his Sinai Hospital medical records, negligently failed to appropriately explain Mr. Burkley's clinical condition and medical history to the on-call provider, and otherwise negligently failed to timely take appropriate action to obtain/administer antibiotics to Mr. Burkley.").  In any event, because the deliberate indifference claim against RN Shifflett remains viable as a result of his interaction with Burkley on August 26, 2017, no separate decision need be reached at this time with respect to his conduct two days prior.

Accordingly, because the deliberate indifference claims survive as to several of Correct Care's medical professionals, Count III, alleging a violation of Article 24 of the Maryland Declaration of Rights, remains viable as to the corporate entity under the doctrine of *respondeat superior*.

### B.   Failure to Obtain Informed Consent

The Amended Complaint alleges that each Defendant is liable for failure to obtain informed consent to the treatment provided to Burkley.  ECF 19 at 31–32.  Under Maryland law, an informed consent claim focuses on whether a physician made an adequate disclosure of information regarding a patient's procedure or treatment.  *McQuitty v. Spangler,* 410 Md. 1, 18-19 (2009). "The gravamen of an informed consent claim, therefore, is a healthcare provider's duty to communicate information to enable a patient to make an intelligent and informed choice, after full and frank disclosure of material risk information and the benefit of data regarding a proposed course of medical treatment."  *Id.* at 22.  Inherent in a finding of a failure to disclose adequate information, then, is a suggestion that the healthcare professional possessed the information that should have been disclosed.

The Amended Complaint alleges that Defendants did not properly and adequately inform Burkley of, *inter alia,* "the material risks and potential negative consequences of not receiving antibiotics for treatment of an infection of his left lower extremity/knee." ECF 19 ¶ 90.  Plaintiffs have not established, however, that any of the treating medical professionals knew that Burkley was suffering from a serious knee infection.   Whether attributable to Burkley's occasional misrepresentations or omissions in his reporting to the treating professionals, failure to conduct an adequate review of Burkley's medical records, or missing of evident signs of infection, no treating source diagnosed an infection and prescribed antibiotics before August 25, 2017.  In other words, the decisions about treatment the medical professionals provided to Burkley appear to have been

18

premised on a missed diagnosis of a knee infection eventually developing into sepsis, not on a known diagnosis, undisclosed to the patient, addressed with a faulty or inadequate treatment plan.

Under Plaintiffs' theory, because the Correct Care practitioners did not timely diagnose the infection, they did not properly inform Buckley of the risks of their proposed course of treatment. However, in Maryland, medical negligence/medical malpractice and failure to procure informed consent are two distinct legal claims.  For example, in *McQuitty v. Spangler*, 410 Md. 1, 23 (2009), the Court of Appeals discussed "attempting to elucidate the distinction between informing a patient about a proposed treatment, implicating the doctrine of informed consent, and failing to recommend a diagnostic test, implicating a medical malpractice claim."  In *Reed v. Campagnolo*, 332 Md. 226, 241 (1993), the Court further elaborated on the distinction, stating, "But one's informed consent must be to some treatment.  Here, the defendants never proposed that the tests be done."

The analysis in those cases suggests that the facts presented in this case fall squarely on the medical negligence side of the line, as opposed to a lack of informed consent.  Essentially, Plaintiffs charge that Defendants failed to obtain Burkley's informed consent not to receive treatment for his serious knee infection.  As noted above, the uncontroverted evidence suggests that the treating medical sources did not recognize the infection until belatedly attempting to treat it with antibiotics just one day before Burkley's passing.  Plaintiffs' remedy for Defendants' failure to recognize Burkley's medical condition lies in their medical negligence claims, if the factfinder determines that one or more of the medical sources failed to comply with the standard of care. Accordingly, Defendants' motion for summary judgment as to Count V will be granted.

### C.  Defendant LPN Gainey-Hodiste

LPN Gainey-Hodiste had a single, limited interaction with Burkley on August 24, 2017. Her notes, in totality, reflect the following: "gave urine spec cup at 1pm. I/M refused until he speaks with his lawyer first.  C/O Sullivan got phone ready for I/M to make his phone call to "Brown," as requested by I/M." ECF 42-3 Exh. 28.

At deposition, LPN Gainey-Hodiste testified that she only remembers "who Mr. Burkley was vaguely."  ECF 41-3, Ex. 12 at 10:3.  She testified that if she took a patient a urine cup, "it would have been told to me to do that either from the HSA, the physician, the charge nurse." *Id.* at 10:17-19.  In terms of his appearance, she remembered "thinking he was a lot older" than he was, but did not have any other recollections. *Id.* at 14:1-2. She did not remember whether she actually went into the cell, and did not remember anything about his medical condition. *Id.* at 14:5-9.

Plaintiffs premise their argument about LPN Gainey-Hodiste's negligence (and deliberate indifference) on the testimony of an expert witness, RN Susan Santamaria, who testified as follows:

> It appears that Sandra Gainey-Hodiste was involved in the patient's care.  She brought a urine specimen cup over to the patient from my recall of the records reviewed. . . . And, again, seeing somebody in the condition that, you know, as I've repetitively mentioned, that we know him to be disoriented, having bouts of incontinence on the floor, having some confusion, as a medical professional, I'm, you know, I don't care if your request was to bring over a urine specimen cup.  But when you walk and walk stumble upon a patient who looks clinically unwell, and I can say that because the corrections officers had been reporting that same fact, it's incumbent on a medical professional to follow up on those observations.  To talk to the patient to obtain vital signs, to ask him questions.

ECF 43 at Ex. 23.

Based on the factual record before the Court, Plaintiffs' claims against LPN Gainey-Hodiste are insufficient as a matter of law.  Plaintiffs adduce no evidence to establish that LPN Gainey-Hodiste was aware, or should have been aware, of any of the factors RN Santamaria

believed to trigger a duty to conduct further investigation:  disorientation, incontinence, or confusion.  Instead, the factual record establishes only a very limited interaction – the handing of a urine cup to the inmate as directed by a superior, upon which the inmate expressed a desire to speak with his lawyer.  Nothing suggests that LPN Gainey-Hodiste noticed any disorientation, incontinence, or confusion during that very brief interaction.  Plaintiffs contend that LPN Gainey-Hodiste "recklessly disregarded Mr. Burkley's serious medical needs despite his obvious, deteriorating medical condition." ECF 42-1 at 20. However, there is no evidence that LPN Gainey-Hodiste believed Burkley to look clinically unwell during their brief interaction, other than looking somewhat older than his stated age.  Summary judgment for LPN Gainey-Hodiste is therefore appropriate on all claims.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Partial Summary Judgment, ECF 41, will be GRANTED IN PART AND DENIED IN PART.  As to Counts II and III, judgment will be granted in favor of Defendant Watson, and summary judgment as to Count II will be granted in favor of Defendant Correct Care.  Summary judgment in favor of all Defendants will be granted as to Count V (Informed Consent).   Summary judgment in favor of Defendant Gainey-Hodiste will be granted as to all claims. A separate Order follows, which will include a scheduling conference to discuss future proceedings, including a trial date.


Dated:  May  6, 2020                                    _____
                                                                          /s/
                                                            Stephanie A. Gallagher
                                                            United States District Judge